UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
MARK A. DECAMBRE,

               Plaintiff,

                                   <u>MEMORANDUM & ORDER</u>
      -against-                   14-CV-6864 (JS)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.
----------------------------------------X
APPEARANCES
For Plaintiff:      Christopher J. Bowes, Esq.
                   54 Cobblestone Drive
                   Shoreham, NY 11786

For Defendant:      Robert W. Schumacher, II, Esq.
                   United States Attorney's Office
                   Eastern District Of New York
                   610 Federal Plaza
                   Central Islip, NY 11722

SEYBERT, District Judge:

       Plaintiff Mark A. DeCambre ("Plaintiff") brings this action pursuant to Section 405(g) of the Social Securities Act, 42 U.S.C. § 405(g), challenging the Commissioner of Social Security's (the "Commissioner") denial of his application for Supplemental Security Income disability benefits. Presently before the Court are the Commissioner's motion for judgment on the pleadings (Docket Entry 11) and Plaintiff's cross-motion for judgment on the pleadings (Docket Entry 14). For the following reasons, the Commissioner's motion is DENIED and Plaintiff's motion is GRANTED and this matter is REMANDED to the Commissioner

for further consideration in accordance with this Memorandum and Order.

BACKGROUND[1]

I.   Procedural Background

On April 16, 2012, Plaintiff filed for social security disability benefits, claiming a disability since April 1, 2012. (R. 19.)   Plaintiff alleges that he is disabled based on a schizoaffective disorder, polysubstance abuse disorder, back pain, a hearing and vision impairment, and human immunodeficiency virus ("HIV").  (R. 21-22.)   After his application was denied on August 21, 2012, (R. 97), Plaintiff requested a hearing before an administrative law judge, (R. 101-103).  A video hearing took place on February 26, 2014 before Administrative Law Judge Michael A. Rodriguez (the "ALJ").  (R. 19, 32.)  Plaintiff was represented by counsel at the hearing and the ALJ heard testimony from Plaintiff and Dr. David Vandergoot,[2] a vocational expert.  (R. 39.)

On April 29, 2014, the ALJ issued a decision finding that Plaintiff is not disabled.  (R. 19-32.)  On May 7, 2014,

_____

[1] The background is derived from the administrative record filed by the Commissioner on March 23, 2015.  (Docket Entry 9.)  "R." denotes the administrative record.

[2] While the hearing transcript states that the vocational expert is named Dr. "Vancoots," (R. 38) the Court notes that the record contains a curriculum vitae for Dr. "Vandergoot." (R. 152.)  For ease of reference, the Court will refer to the vocational expert as Dr. Vandergoot throughout.

Plaintiff sought review of the ALJ's decision by the Appeals Council. (R. 12.) On September 16, 2014 the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-6.)

Plaintiff then commenced this action on November 21, 2014. The Commissioner and Plaintiff filed cross-motions for judgment on the pleadings on June 5, 2015 and July 28, 2015, respectively. (Docket Entries 11, 14.)

II. <u>Evidence Presented to the ALJ</u>

    A. <u>Testimonial Evidence</u>

At the time of the administrative hearing, Plaintiff was forty-three years old. (R. 42.) He completed grade twelve in Jamaica. (R. 48.) Plaintiff is able to read and write English but is "not very good at it." (R. 49.) Plaintiff testified that he lives with his girlfriend and generally spends his days watching television and looking outside. (R. 44, 70.)

Plaintiff testified that his last job was a maintenance position at a building in Manhattan, where he cleaned, put the garbage out, shoveled snow, and performed repairs. (R. 51-52.) Previously, he had worked in general construction and for a cleaning service. (R. 55.)

Plaintiff testified that he suffers from rib pain, back pain, deafness in his right ear, pain in his left ear, and vision issues with respect to his right eye. (R. 58-62.) Plaintiff has

suffered from bloody stools and frequent urination for at least five years.  (R. 64, 72-74.)  Plaintiff also has HIV and takes one medication for that condition.  (R. 67.)  He testified that he suffers from a burning sensation in his feet that his doctor advised was a symptom of HIV.  (R. 68.)

Plaintiff testified that he began seeing a psychiatrist in 2011 because he was "always getting angry, getting into fights, breaking things, and destroying apartments."  (R. 64-65.)  He was prescribed medication for schizophrenia, which helps his condition but causes drowsiness, nausea, vomiting, and diarrhea.  (R. 65)  Plaintiff indicated that this medication makes him feel "like it suck[s] my whole soul out of my body, like weak and can't get up sometime[s]."  (R. 67.)  Plaintiff testified that he bites and chews on his fingers and has a "bad nerves problem" as a result of his mental condition.  (R. 66.)  He hears voices and sees "shadows or things moving" every day.  (R. 75.)  Plaintiff testified that he was admitted to a mental hospital for one month after chasing his ex-girlfriend with a knife during an argument.  (R. 87-88.)

Dr. Vandergoot, an impartial vocational expert, appeared and testified.  (R. 77-85.)  Dr. Vandergoot utilized two job titles to categorize Plaintiff's vocational profile: (1) "construction work II", an unskilled position with very heavy exertion, and (2) "commercial or institutional cleaner," an unskilled position that is heavy in exertion.  (R. 78.)  Dr. Vandergoot testified that

Plaintiff would have sufficient experience to accept one of those positions if they became available. (R. 78-80.)

The ALJ asked Dr. Vandergoot to assume the residual functional capacity of an individual who: (1) is able to (a) sit for six hours in an eight hour day, (b) stand and walk for six hours in an eight hour day, and (c) lift and carry fifty pounds occasionally and twenty-five pounds more frequently; (2) should not engage in upper extremity pushing or pulling or crawling and cannot use ladders, ropes, or scaffolds; (3) is able to engage in frequent overhead distance and directional reaching; (4) cannot perform jobs requiring binocular vision; (5) cannot be around loud background noise; (6) should avoid concentrated exposure to fumes, gases, dusts, and odors; (7) cannot work around workplace hazards; and (8) must be limited to low-stress, unskilled positions that require only sporadic decision making and no interaction with the public. (R. 80.) Dr. Vandergoot testified that such an individual could not perform Plaintiff's past relevant work but could perform the following positions: (1) electronics worker, an unskilled position with approximately 150,000 jobs available in the national economy, (2) printing screen assembler, an occupation with approximately 100,000 jobs available in the national economy, and (3) grocery bagger, an occupation with approximately 50,000 jobs available in the national economy. (R. 82-84.)

B.  Medical Evidence

1.  PATH Center

On March 29, 2012, Plaintiff was examined at the PATH Center ("PATH"). (R. 322.) Plaintiff had been referred for HIV management and complained of poor sleep, appetite, back and rib cage problems, hearing problems in his right ear, and pain in his right foot heel. (R. 322.) Plaintiff's past medical history indicated diagnoses of HIV and schizoaffective disorder. (R. 326.) Plaintiff reported that he was taking Atripla for HIV and Zoloft and Trazodone for his schizoaffective disorder. (R. 322.) He was described as "well developed and well nourished, alert and oriented [and] in no apparent distress." (R. 325.) He also indicated that he was using marijuana and addicted to "antibiotics from [the] streets." (R. 323, 326.) During his visit, Plaintiff requested a letter for his disability application. (R. 326.)

On April 12, 2012 Plaintiff was examined at PATH. (R. 332, 371, 457-48.) He reported that he had insurance problems and was unable to obtain medications for two months. (R. 332.) However, Plaintiff's schizoaffective disorder was stable and he had no complaints. (R. 457-58.) On June 14, 2012, Plaintiff saw Dr. Bakshi at PATH and stated that he was no longer taking Trazodone and Zoloft and he wished to see a psychiatrist. (R. 368.) Nevertheless, Dr. Bakshi noted that Plaintiff's schizoaffective disorder was stable and he was "well developed and

well nourished, alert and oriented [and] in no apparent distress."
(R. 368-69.)

On July 16, 2012, Plaintiff returned to PATH and saw Dr.
Bakshi. (R. 363-66.) Plaintiff reported that he was taking Zoloft
and Trazodone but was agitated and dizzy as a result of the
medications. (R. 365.) Dr. Bakshi noted that Plaintiff's
schizoaffective disorder was stable. (R. 365.) On September 13,
2012, Plaintiff had a follow up appointment at PATH. (R. 465.)
One section of the PATH progress report indicates that Plaintiff
was taking Zoloft and Trazadone regularly; however, Dr. Berkowitz
indicated that Plaintiff's "[a]ffect remains bizarre, never went
for psych appt, didn't go to pain management; missing doses fairly
frequently." (R. 465, 470.) Plaintiff reported that he did not
have any mood changes or suicidal ideations. (R. 465.)

Plaintiff had appointments at PATH on January 31, 2013,
and February 28, 2013. (R. 473, 477.) On both occasions,
Plaintiff did not report any mood changes or suicidal ideations.
(R. 473, 477.) On July 25, 2013, Plaintiff returned to PATH for
a follow up visit. (R. 411.) Plaintiff denied that he suffered
from any mood changes or suicidal thoughts and reported that he
was taking Atripla, Zoloft and Trazadone regularly. (R. 411.)
Plaintiff returned to PATH on January 21, 2014 after missing

appointments since July 2013.  (R. 453.)  Plaintiff reported that his mood was stable with no suicidal ideations.  (R. 453.)

        2.   <u>Dr. Thukral</u>

On July 18, 2012, Dr. Vinod Thukral conducted an internal medicine examination of Plaintiff pursuant to a referral from the Division of Disability Determination.  (R. 334-38.)  Plaintiff denied complications from HIV and indicated that his injuries to his lower chest and lower back were caused by work related injuries.  (R. 334.)  Plaintiff also advised that he drinks "a lot" on a daily basis, smokes approximately ten joints of marijuana per day, and smokes approximately two cigars per day.  (R. 335.)  Upon examination, Dr. Thukral observed that Plaintiff was blind in his right eye with decreased visual acuity in the left eye.  (R. 336, 338.)  Dr. Thukral assessed the following diagnoses: lower backache; left lower chest pain due to an injury; HIV; insomnia; schizoaffective disorder; right ear deafness; right eye blindness; active alcohol abuse; active marijuana abuse; and decreased visual acuity in the left eye.  (R. 337-38.)

        3.   <u>Dr. Morcos</u>

On July 18, 2012, Plaintiff had a consultative examination with Dr. Sally Morcos, a psychologist.  (R. 339-45.)  Plaintiff advised that he was hospitalized at Kings County Hospital Center in 2009 due to his schizoaffective disorder.  (R. 339.)  Plaintiff reported difficulty sleeping, appetite loss, weight

loss, depression since childhood, and irritability and loneliness related to his HIV diagnosis. (R. 340.) Plaintiff reported auditory and visual hallucinations. (R. 341.) Plaintiff also reported that he smoked cigars, drank "as much as I can," and would smoke marijuana daily if he was able to (R. 341-42.) Dr. Morcos noted that Plaintiff took the train to his appointment and that he reported being able to dress, bathe, groom himself, take public transportation without assistance, and perform light cleaning. (R. 339, 343.) However, Plaintiff provided the incorrect date and was unable to indicate why he was being evaluated or the name and role of the evaluator. (R. 343.) Plaintiff was able to perform counting and simple calculations but his serial threes contained one error. (R. 343.)

Dr. Morcos diagnosed Plaintiff with schizoaffective disorder, alcohol dependence, and cannabis dependence. (R. 344.) Dr. Morcos found that Plaintiff could understand simple directions and instructions, independently perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks under supervision, and relate adequately to others. (R. 344.) Dr. Moros found that Plaintiff could not make appropriate decisions or cope with stress

appropriately, and that Plaintiff's "[d]ifficulties are caused by prolonged substance abuse." (R. 344.)

Dr. Morcos noted that after their appointment, Plaintiff stopped her in the hallway and informed her that his girlfriend called and advised him that he "'flipped out' and held a knife to her throat." (R. 345.) Plaintiff indicated that he had no recollection of this event. (R. 345.) Emergency medical services were contacted and when they arrived, Plaintiff advised that the incident had actually occurred three years prior rather than within the past few days. (R. 345.)

    4.  <u>Dr. Belsky</u>

On August 20, 2012, Dr. J. Belsky, completed a psychiatric review technique form. (R. 383-396.) Dr. Belsky noted Plaintiff's drug induced mood disorder and schizoaffective disorder as well as "[h]eavy alcohol and marijuana abuse current and long standing." (R. 386, 391.) Dr. Belsky concluded that Plaintiff was moderately limited in the following functional limitations: restriction of activities of daily living; difficulties in maintaining concentration, persistence or pace; and difficulties in maintaining social functioning. (R. 393.) Dr. Belsky noted that Plaintiff had "one or two" repeated episodes of deterioration of extended duration. (R. 393.)

Dr. Belsky also completed a mental residual functional capacity assessment. (R. 403-406.) Dr. Belsky concluded that

Plaintiff was markedly limited in his ability to appropriately interact with the general public and otherwise either moderately limited or not significantly limited in areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. 403-404.) Dr. Belsky noted that Plaintiff's complaints of depression, suicidal ideation, auditory hallucinations, and paranoid ideation were vague, inconsistent, and appeared to be exaggerated, and that "[Plaintiff] was evasive and his speech was tangential." (R. 405.) Dr. Belsky concluded that Plaintiff "is not a reliable historian, and is able to perform simple tasks in a low stress work setting." (R. 405.)

5.    Dr. Verdrager

On August 20, 2012, Dr. Verdrager completed a physical residual functional capacity assessment with Plaintiff's primary diagnosis being HIV. (R. 397-402.) Dr. Verdrager indicated that Plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk about six hours in an eight hour workday with normal breaks; sit for about six hours in an eight hour workday with normal breaks; and push and/or pull without limitations. (R. 398.) Dr. Verdrager assessed Plaintiff as having frequent postural limitations with respect to climbing, balancing, stooping, kneeling, crouching, and crawling, but no manipulative limitations (i.e., handling, fingering, feeling, or reaching). (R. 399.)

Plaintiff's blindness in his right eye was noted as was his 20/30 vision in his left eye; however, Dr. Verdrager stated that Plaintiff had "unlimited" near acuity, far acuity, accommodation, and color vision. (R. 399.) Dr. Verdrager did not indicate whether Plaintiff's depth perception or field of vision was limited or unlimited. (R. 399.)

      6.   <u>Dr. Khanna</u>

On May 16, 2013, Plaintiff initiated psychiatric care with Dr. Sangeet Khanna. (R. 503.) Plaintiff reported "feeling stressed out" and anxious and admitted to hearing voices at times. (R. 503.) Dr. Khanna concluded that Plaintiff's "speech is clear, mood is fair, affect is constricted, thought process, is logical and goal directed," and that Plaintiff's memory and concentration is fair. (R. 503.) Dr. Khanna diagnosed Plaintiff with paranoid schizophrenia and THC dependence. (R. 503.)

On May 29, 2013, Plaintiff had another appointment with Dr. Khanna. (R. 504.) Plaintiff reported that he was not able to obtain medications due to insurance issues, and that he was not sleeping well, had poor appetite, and had panic attack episodes. (R. 504.) Dr. Khanna concluded that Plaintiff's "speech is clear, mood is fair, affect is constricted, thought process, is logical

and goal directed" and that he had "[n]o voices" and fair memory and concentration.  (R. 504.)

On July 17, 2013, Dr. Khanna completed a Medical Source Statement.  (R. 420-22.)  Dr. Khanna indicated that Plaintiff had a "complete loss of ability" to sustain performance of the following activities during an eight hour workday: responding appropriately to co-workers, responding to customary work pressures, responding appropriately to changes in the work setting, exercising good judgment on the job, and behaving in an emotionally stable manner.  (R. 421.)  Dr. Khanna also indicated that Plaintiff would likely miss "4+" days of work per month; his condition lasted or would be expected to last for twelve months or more; and that drugs and alcohol abuse were not a material factor in Plaintiff's mental condition.  (R. 421.)  However, Dr. Khanna also stated that if Plaintiff's drug and/or alcohol use were to stop, there would be changes in his limitations.  (R. 421.)

7.  Dr. Rubinstein

On November 1, 2013, Plaintiff met with Dr. Richard N. Rubinstein, a psychiatrist.  (R. 419.)  Plaintiff reported feeling stressed and admitted to paranoia and auditory hallucinations, reporting that "my soul is coming out of my body."  (R. 419.)  However, Plaintiff denied hearing voices, having homicidal or suicidal ideations, or having any sleep disturbances.  (R. 419.)  Dr. Rubinstein observed that Plaintiff's thought process was

logical and goal directed, his concentration was fair, his recent and remote memory were intact, and his mood was "mildly dysphoric." (R. 419.)

DISCUSSION

I.   Standard of Review

In reviewing the ruling of an ALJ, the Court does not determine de novo whether Plaintiff is entitled to disability benefits.  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard."  Persico v. Barnhart, 420 F. Supp. 2d 62, 70 (E.D.N.Y. 2006) (internal quotations marks and citation omitted).  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists.  See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion."  Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)).  The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts.  See id.

14

To determine if substantial evidence exists to support the ALJ's findings, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted).

II.  Determination of Disability

        A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive disability benefits. See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. § 423(a), (d).  A claimant is disabled under the Act when he can show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

        The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act. See 20 C.F.R. §§ 404.1520, 416.920.  First, the Commissioner considers whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, the

Commissioner considers whether the claimant suffers from a "severe medically determinable physical or mental impairment" or a severe combination of impairments that satisfy the duration requirement set forth at 20 C.F.R. § 404.1509.[3]  Third, if the impairment is "severe," the Commissioner must consider whether the impairment meets or equals any of the impairments listed in Appendix 1 of the Social Security regulations.   20 C.F.R. § 404.1520(a)(4)(iii). "These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment.   If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995) (citation omitted).  Fourth, if the impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity ("RFC") to perform tasks required in his previous employment.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth, if the claimant does not have the RFC to perform tasks in his or her previous employment, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform.  20 C.F.R. § 404.1520(a)(4)(v).  If not, the claimant is disabled and entitled to benefits.

---

[3] 20 C.F.R. § 404.1509 provides that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."

The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. See Shaw, 221 F.3d at 132. "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Boryk ex rel. Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003).

III. The ALJ's Decision

The ALJ applied the five-step analysis described above and determined that Plaintiff is not disabled. (R. 19-32.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 16, 2012. (R. 21.)

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: (1) schizoaffective disorder, (2) polysubstance abuse disorder, (3) back pain, (4) HIV, (5) hearing impairment, and (6) vision impairment in the right eye. (R. 21.)

At step three, the ALJ concluded that Plaintiff's impairments, either singularly or in combination, did not meet or equal the severity of one of the impairments listed in Appendix 1 of the Social Security regulations. (R. 22.) In reaching this

conclusion, the ALJ stated that he considered the following limitations: 12.03 (schizophrenic, paranoid and other psychotic disorders), 12.04 (affective disorders), 12.09 (substance addiction disorders), 1.00 (musculoskeletal), and 14.00 (immune system disorder). (R. 22-24.) See also 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ concluded that Plaintiff has the residual functional capacity to perform medium work, as defined in 20 C.F.R. § 416.967(c), except that he is limited to unskilled employment tasks in a low-stress position that require only occasional decision making or exercise of judgment. (R. 24.) The ALJ further concluded that Plaintiff must avoid public interaction and is limited to occasional interaction with supervisors and jobs that deal with things, rather than people. (R. 24.) The ALJ found that Plaintiff must avoid the following activities: pushing and pulling with the upper extremities; crawling; ladders, ropes, or scaffolds; workplace hazards; and operating motor vehicles, moving machinery, or equipment. (R. 24.) Additionally, the ALJ concluded that Plaintiff must avoid jobs that require binocular vision or involve concentrated exposure to environmental irritants or high background noise. (R. 24.)

At step four, the ALJ concluded that Plaintiff could not perform his past relevant work. (R. 31.)

Finally, at step five, the ALJ concluded that Plaintiff could perform other work existing in the national economy based on his age, education, work experience, residual functional capacity, and Dr. Vandergoot's expert testimony. (R. 31-32.) Accordingly, the ALJ determined that Plaintiff was not disabled. (R. 32.)

In reaching his decision, the ALJ gave "no weight" to Dr. Khanna's Medical Source Statement, finding that Dr. Khanna's opinion that Plaintiff's mental impairment resulted in significant limitations is "inconsistent with objective clinical findings from his own examinations indicating fair impulse control, concentration and memory; as well as his own statements that the claimant's psychiatric condition was stable." (R. 29.) The ALJ accorded "great weight" to the opinion of Dr. Morcos[4] because it was consistent with evidence from Plaintiff's treating physicians that Plaintiff has a "fairly good mental status" when compliant with his medication. (R. 27.) The ALJ similarly gave Dr. Belsky's opinion "great weight" based on its consistency with progress notes. (R. 27.)

---

[4] The ALJ does not specifically reference Dr. Morcos by name in his discussion of the "[g]reat weight accorded to the evaluating psychologist's opinion." (R. 27-29.) However, the ALJ notes that the evaluating psychologist's consultative examination took place in July 2012 and the ALJ references Exhibit 6F, which is Dr. Morcos' psychiatric evaluation dated July 18, 2012. (R. 339.)

IV.  Analysis of the ALJ's Decision

          The Commissioner filed her motion first and argues that
each step of the ALJ's decision is supported by substantial
evidence.  (See generally Comm'r Br., Docket Entry 11-1.)
Plaintiff counters that the ALJ's decision should be reversed and
remanded on the following grounds: (1) the ALJ's failure to
appropriately consider Plaintiff's psychiatric limitations; and
(2) the ALJ's improper reliance on Vandergoot's testimony, which
did not appropriately address Plaintiff's eyesight limitations.
(Pl.'s Br., Docket Entry 15, at 17-23.)  The Court addresses each
argument below.

     A.   Plaintiff's Psychiatric Limitations

          Plaintiff argues that the ALJ inappropriately discounted
the functional limitations of Plaintiff's schizoaffective disorder
in finding that he is capable of meeting the mental demands of
unskilled work.  (Pl.'s Br. at 19.)  Particularly, Plaintiff
alleges that the ALJ erred in: (1) dismissing the opinion of Dr.
Khanna and instead imposing his "lay opinion" (2) failing to
address certain portions of Dr. Morcos' report; and (3) concluding
that his hallucinations were "unremarkable or insignificant."
(Pl.'s Br. at 19; Pl.'s Reply Br., Docket Entry 19, at 2.)  The
Court finds that remand is necessary based on the ALJ's failure to
adequately develop the record before giving no weight to Dr.
Khanna's opinion.

The "treating physician rule" provides that the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight."[5] Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the regulations state:

> Generally, we give more weight to opinions from your treating sources . . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). When an ALJ does not accord controlling weight to the medical opinion of a treating physician, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008) (citations omitted). Such factors include: "(1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's

---

[5] A "treating source" is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 146.902.

consistency with the record as a whole; and (5) whether the physician is a specialist." Id.

"[T]he Court must assess whether the ALJ satisfied his threshold duty to adequately develop the record before deciding the appropriate weight of a treating physician's opinion." Khan v. Comm'r of Social Sec., No. 14-CV-4260, 2015 WL 5774828, at *13 (E.D.N.Y. Sept. 30, 2015). Pursuant to regulations that took effect on March 26, 2012, the ALJ is no longer required to re-contact a treating physician to resolve an inconsistency or insufficiency in the evidence. See 20 C.F.R. § 404.1520b; Gabrielsen v. Colvin, No. 12-CV-5694, 2015 WL 4597548, at *5-6 (S.D.N.Y. Jul. 30, 2015). Instead, the ALJ may resolve any inconsistency or insufficiency by: (1) re-contacting the treating physician; (2) requesting additional existing records; (3) asking the claimant to undergo a consultative examination at the Commissioner's expense; or (4) asking the claimant or others for additional information. 20 C.F.R. § 404.1520b(c). However, the ALJ may choose not to seek clarification from a medical source where he or she "knows from experience that the source either cannot or will not provide necessary evidence." 20 C.F.R. § 416.920b(c)(1).

The Second Circuit has directed that notwithstanding the revised 20 C.F.R. § 404.1520b, "it may be incumbent upon the ALJ to re-contact medical sources in some circumstances." Khan, 2015

WL 5774828, at *14 (citing Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013)). In applying 20 C.F.R. § 404.1520b, courts in this Circuit have held that where additional information is needed regarding the opinion of a treating physician, the ALJ should contact the treating source "for clarification and additional evidence." McClinton v. Colvin, No. 13-CV-8904, 2015 WL 6117633, at *23 (S.D.N.Y. Oct. 16, 2015) (collecting cases). See also Gabrielsen, 2015 WL 4597548, at *6-7 (Holding that the ALJ had an obligation to re-contact the treating physician because she would likely be able to explain many of the inconsistences in her statements.); Vasquez v. Comm'r of Social Sec., No. 14-CV-6900, 2015 WL 4562978, at *17 (S.D.N.Y. Jul. 21, 2015) (Holding that the ALJ's rejection of the treating physician's opinion "without first attempting to clarify any gaps or perceived inconsistencies in the record constituted legal error and grounds for remand."). But see Vanterpool v. Colvin, No. 12-CV-8789, 2014 WL 1979925, at *17 (S.D.N.Y. May 15, 2014) ("Because the ALJ did not reject [the treating physician's] opinion due to gaps in the record, he was not required to contact the physician for further information or clarification.").

As previously noted, Plaintiff met with Dr. Khanna on two occasions during May 2013 and Dr. Khanna completed a Medical Source Statement in July 2013. (R. 420-22, 503-504.) The ALJ accorded Dr. Khanna's opinion "no weight," finding that the

limitations set forth in the Medical Source Statement were inconsistent with Dr. Khanna's prior examinations. (R. 29.) The Court finds that the ALJ had an obligation to attempt to clarify the inconsistency in Dr. Khanna's opinion prior to according his opinion no weight. However, neither the record nor the ALJ's decision indicate that the ALJ attempted to utilize one of the methods set forth in 20 C.F.R. § 404.1520b--particularly, re-contacting Dr. Khanna--or that the ALJ knows from experience that Dr. Khanna cannot or will not provide the requisite clarification. Parenthetically, it appears that, like the treating physician in <u>Gabrielsen</u>, Dr. Khanna would likely be able to explain many of the inconsistencies in his statements. <u>See</u> <u>Gabrielsen</u>, 2015 WL 4597548, at *6-7.

Accordingly, remand is appropriate to enable the ALJ to develop the record with respect to Dr. Khanna's opinion. <u>See</u> 42 U.S.C. § 405(g) (The district court is empowered to reverse the Commissioner's decision with or without remanding the matter for rehearing). <u>See also</u> <u>Khan</u>, 2015 WL 5774828, at *15 (remanding based on the ALJ's failure to appropriately develop the record before assigning minimal weight to the treating physicians' opinions). Based on the Court's determination that remand is required on this ground, the Court need not address Plaintiff's remaining arguments regarding the ALJ's determination that he is capable of meeting the mental demands of unskilled work.

B.   Testimony of Vocational Expert

As noted above, the vocational expert in this matter, Dr. Vandergoot, testified that an individual would be able to perform the positions of electronics worker, printing screen assembler, and grocery bagger (the "Jobs") with a residual functional capacity that included, among other things, the inability to perform jobs requiring binocular vision. (R. 80-83.) Dr. Vandergoot testified that his testimony was consistent with the "Dictionary Occupational Titles and its related publications."[6] (R. 85.)  Plaintiff argues that the ALJ erred in failing to address the conflict between Dr. Vandergoot's testimony and the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations. (Pl.'s Br. at 20-21.)  Particularly, Plaintiff avers that the Jobs require "frequent" or "occasional" near acuity and "occasional" depth perception and thus are inappropriate for Plaintiff due to his blindness in his right eye.  (Pl.'s Br. at 22-23.)  The Court finds that remand is appropriate to permit the ALJ to develop the record and potentially resolve any conflict between Dr. Vandergoot's testimony and the DOT.

---

[6] The Dictionary of Occupational Titles is a Department of Labor publication that "gives a job type a specific code . . . and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." Brault v. Social Sec. Admin. Comm'r, 683 F.3d 443, 446 (2d Cir. 2012).

The Court acknowledges that Plaintiff's counsel not only stipulated to Dr. Vandergoot's qualifications, but also declined to cross-examine Dr. Vandergoot. (R. 77, 84-85.) However, "in the non-adversarial context of a disability benefits hearing it remains the responsibility of the ALJ to fully develop the medical record so as to [e]nsure an accurate assessment of a claimant's [residual functional capacity]." Verdaguer v. Colvin, No. 12-CV-6858, 2013 WL 6426931, at *11 (S.D.N.Y. Dec. 9, 2013). While the ALJ found that Dr. Thurkal's consultative examination "indicate[s] possible limitations in depth perception which are considered in the [Plaintiff's] residual functional capacity, but are not indicative of visual deficits that have significantly limited the claimant's ability to engage in various activities," (R. 28), the record is silent as to the effect of Plaintiff's right-eye blindness on his depth perception. Although Dr. Thurkal observed that Plaintiff was blind in his right eye with decreased visual acuity in the left eye, he did not indicate the extent that Plaintiff's right-eye blindness affects his depth perception. (R. 336, 338.) Dr. Verdrager concluded that despite his right-eye blindness, Plaintiff had "unlimited" near acuity, far acuity, accommodation, and color vision, but did not indicate whether Plaintiff's depth perception was limited.[7] (R. 399.) While the

---

[7] The ALJ accorded "little weight" to Dr. Verdrager's internal consultative examination with respect Plaintiff's back pain "in

ALJ noted that "[a]mple records . . . indicate no limitations in the [Plaintiff's] ability to travel, handle objects, engage in cleaning or self-care activities, or otherwise get around due to vision difficulties," the Court finds that a clearer explanation is required as to Plaintiff's depth perception.  (R. 28.)

Additionally, the Court finds that the record must be further developed with respect to Plaintiff's near and far acuity. As previously noted, Dr. Thukral concluded that Plaintiff has decreased visual acuity in his left eye; however, Dr. Verdrager concluded that Plaintiff has "unlimited" near acuity and far acuity.  (R. 336, 399.)  A clearer explanation is required to resolve this apparent inconsistency.

The DOT provides that the occupation of electronics worker requires frequent near acuity, no far acuity, and occasional depth perception, U.S. Dep't of Labor, Dictionary of Occupational Titles, Code 726.687-010, 1991 WL 679633 (4th ed., 1991); the occupation of printing screen assembler requires frequent near acuity, no far acuity, and occasional depth perception, U.S. Dep't of Labor, Dictionary of Occupational Titles, Code 979.684-042,

---

light of records documenting a history of treatment for back pain stemming from a motor-vehicle accident."  (R. 29.) Although the ALJ did not reference Dr. Verdrager by name, he referred to Exhibit 9F, which is Dr. Verdrager's Physical Residual Functional Capacity Assessment.  (R. 29, 397.)  The ALJ did not indicate what, if any, weight Dr. Verdrager's examination was accorded with respect to Plaintiff's vision.

1991 WL 688690 (4th ed., 1991); and the occupation of grocery bagger requires occasional near acuity, no far acuity, and occasional depth perception, U.S. Dep't of Labor, Dictionary of Occupational Titles, Code 920.687-014, 1991 WL 687964 (4th ed. 1991). In the event that the ALJ determines that Plaintiff's depth perception and/or visual acuity results in a residual functional capacity in which he must avoid jobs with occasional depth perception or occasional to frequent near acuity, he will be required to resolve the conflict between the DOT and Dr. Vandergoot's testimony. Patti v. Colvin, No. 13-CV-1123, 2015 WL 114046, at *6 (W.D.N.Y. Jan. 8, 2015) ("The Social Security Regulations [ ] place an affirmative duty on the ALJ to identify and resolve any conflict between the vocational expert's testimony and the DOT before relying on such testimony."). See also Brault, 683 F.3d at 446.

Accordingly, remand is appropriate where, as here, "due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" Kirkland v. Astrue, No. 06-CV-4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2009) (alterations in original) (quoting Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004)). See also 42 U.S.C. § 405(g).

## CONCLUSION

For the foregoing reasons, the Commissioner's motion is

DENIED, Plaintiff's motion is GRANTED, and this action is REMANDED

for further proceedings consistent with this Memorandum and Order.

The Clerk of the Court is DIRECTED to mark this matter CLOSED.


                              SO ORDERED


                              /s/ JOANNA SEYBERT_____
                              Joanna Seybert, U.S.D.J.

Dated:     March __8__, 2016
           Central Islip, New York